UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TONI LEMLY AMBERGE and BRANDON XAVIER AMBERGE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-3314** |
| **JERRY LAMB, FRANK LAMB and AMICA MUTUAL INSURANCE CO.** | **SECTION "C"(1)** |

**ORDER AND REASONS**[1]

Plaintiffs Toni Lemly Amberge and Brandonn Xavier Amberge brought suit against Defendants seeking special damages for past, present and future medical expenses, punitive damages, and general damages for past, present and future pain and suffering, arising out of an incident in which Defendant Jerry Lamb rear-ended their vehicle three times and backed into the front of their vehicle once. (Rec. Doc. 1-4 at 5-8).

Before the Court is Plaintiffs' Motion for Partial Summary Judgment. (Rec. Doc. 15). Plaintiffs argue that each of the four collisions between Lamb's vehicle and theirs constituted a separate insurable event as a matter of law. (Rec. Doc. 15-3). Defendant Amica Mutual Insurance Co. ("Amica"), Plaintiffs' insurer, opposes the Motion, and argues there was only a single insurable event. (Rec. Doc. 20). Having reviewed the record, memoranda of counsel, and the applicable law, Plaintiff's Motion for Partial Summary Judgment is GRANTED for the following reasons.

**I. Jurisdiction**

This Court has subject matter jurisdiction based on diversity of the parties: Plaintiffs are domiciled in Louisiana, Defendants Jerry and Frank Lamb are domiciled in Mississippi, and Amica is incorporated and has its principle place of business in Rhode Island. (Rec. Doc. 6 at 2); 28 U.S.C.

---

[1] Gillian Gurley, a third-year law student at Tulane University, assisted in the preparation of this document.

§ 1332. The parties agree that the amount in controversy exceeds the minimum jurisdictional amount of $75,000, and have submitted evidence that Plaintiffs requested tender checks from Amica in the amount of $100,000 apiece, detailing the medical expenses of both Plaintiffs and the expected general damages for pain and suffering and fright. (Rec. Doc. 6-1 at 12). The Court is satisfied that subject matter jurisdiction exists.

**II. Background**

On September 14, 2009, Plaintiffs were allegedly traveling from Bogalusa, Louisiana, to their home in Slidell. (Rec. Doc. 15-2 at 1). They were driving southbound on Interstate 59, and were nearing the junction with Interstate 12 when Defendant Lamb struck the back of their vehicle with the front of his 1989 Ford Mustang. (Rec. Doc. 15-2 at 2). Plaintiffs allege that this collision did not cause either car to lose control at the time, and so Plaintiff driver moved the minivan into the left lane of the Interstate in order to get out of Lamb's way, while her husband called 911 to report the incident. *Id*. Both cars continued driving and Lamb rear-ended Plaintiffs' vehicle a second time, "thirty seconds to two minutes after the first collision." *Id*. At this point, Mrs. Amberge moved the minivan to the right lane of the Interstate and Lamb passed their vehicle and merged left onto Interstate 10 West. *Id*. Plaintiffs followed and observed Lamb driving at a high rate of speed and weaving in and out of lanes of traffic. *Id*.

Lamb allegedly exited Interstate 10 at US Highway 190/Gause Boulevard, in Slidell, Louisiana. *Id*. Plaintiffs passed the same exit and immediately pulled over onto the right shoulder of Interstate 10. *Id*. Lamb allegedly re-entered Interstate 10 and approached Plaintiffs' vehicle from the rear, drove past them, and pulled onto the shoulder ahead of them. *Id.* at 3. After coming to a stop about 50 yards ahead of Plaintiffs, Lamb allegedly reversed and backed up into the front of

Plaintiffs' vehicle. *Id*. Plaintiffs then drove away from the shoulder and exited the Interstate at Fremaux Avenue, intending to stop at a nearby Slidell Police Department station. Lamb allegedly rear-ended them one final time before he was apprehended by police. *Id*.

Plaintiffs allege that they were on the phone with 911 from the time immediately following the first rear-ending until Lamb was apprehended by the police. (Rec. Doc. 15-5 at 1; Plaintiffs' Exhibit "C"). Plaintiffs allege the four collisions took place within seven minutes of one another. (Rec. Doc. 15-4 at 2).

Lamb was arrested and pleaded guilty to driving while intoxicated, improper lane usage, hit and run, and driving under suspension. (Rec. Doc. 15-8 at 3). Lamb stated that he has no memory of the events of that day. (Rec. Doc. 15-7 at 2).  Lamb's vehicle was uninsured at the time of the incident, but the Plaintiffs were covered by a policy issued by Amica, which included a $500,000 limit in uninsured motorists coverage for each accident. (Rec. Doc. 15-9 at 9).

### III. Law & Analysis

Plaintiffs seek partial summary judgment on the matter of whether there was more than one "accident" for which they are insured. (Rec. Doc. 15). Plaintiffs argue that each time Defendant Lamb's vehicle collided with theirs–four times total–a separate insurable accident occurred, entitling them to a maximum recovery of $500,000 per accident or two million dollars total. (Rec. Doc. 15-3 at 8). Defendant Amica asserts that a single insurable accident occurred, because "the cause of the accident was uninterrupted[.]" (Rec. Doc. 20 at 7). Given the unusual facts of the case, there is little Louisiana law directly on point to answer the question of whether there was one insurable accident or four.

**A. Standard for Summary Judgment**

Summary judgment is only proper when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A genuine issue of fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *see also Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001). When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations." *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l. Wildlife Fed'n.*, 497 U.S. 871, 871-73 (1990); *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 649 (5th Cir. 1992).

The question of whether there was one continuous accident or four distinct accidents must be decided based on the state law of Louisiana. *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 206 (5th Cir. 2007) (when sitting in diversity, a federal court applies state substantive law). The insurance was issued as a Louisiana policy and though neither party briefed the issue of which

4

state's substantive law applies, they seem to agree that "in these Louisiana actions involving the interpretation of insurance policies issued in Louisiana for property located in Louisiana, Louisiana's substantive law controls." *Id*.

Courts deciding the number of insurable accidents have also looked to the language of the insurance policy and evidence of the parties' intent. *See* LA-C.C. art. 2046; *Succession of Fannaly v. Lafayette Ins. Co.*, 805 So.2d 1134, 1137 (La. 2002). If the provisions of the policy are expressed clearly and unambiguously, then the court will interpret them as written. *See* L.S.A.-C.C. art. 2047; *Edwards v. Daugherty*, 883 So.2d 932, 940-41 (La. 2004). When the terms of the contract are ambiguous, however, the relevant unclear provisions are generally construed against the insurer, in favor of coverage. *Sims v. Mulhearn Funeral Home*, 956 So.2d 583, 590 (La. 2007).

**B. The Insurance Policy**

The insurance policy issued by Amica does not define the term "accident," nor does it "exclude intentional acts by uninsured motorists from coverage." (Rec. Doc. 15-9 at 11-12); *Redden v. Doe*, 357 So.2d 632, 633 (La. App. 1978) . It does state that

> A. The limit of liability shown in the Declarations for each person for Uninsured Motorists Coverage is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of bodily injury sustained by any one person in any one auto accident. Subject to the limit for each person, the limit of liability shown in the Declarations for each accident for Uninsured Motorists Coverage is our maximum limit of liability for all damages for bodily injury resulting from any one accident.
>
> This is the most we will pay regardless of the number of:
>
> 1. Insureds;
> 2. Claims made;
> 3. Vehicles or premiums shown in the Declarations; or
> 4. Vehicles involved in the auto accident.
>
> B. No one will be entitled to receive duplicate payments for the same

5

elements of loss under this coverage and:

1. Part A or B of this policy; or
2. Any Underinsured Motorists Coverage provided by this policy.

(Rec. Doc. 15-9 at 17).[2] It is clear and unambiguous that the limitation amount applies to "any one accident." If there were four accidents in this case, then, Amica is obliged to provide uninsured motorist coverage up to the $500,000 cap for each accident.

**C. Determining the Number of Insurable Accidents**

The Fifth Circuit has identified two theories that may be used to determine whether one or more events occurred: the "causation theory," and the "effect theory." The causation theory "determin[es] an event from the standpoint of conduct forming the causative act," while the effect theory is "when an event is judged from the point of view of a person sustaining injury." *Liberty Mutual Ins. Co. v. Rawls*, 404 F.2d 880, 881 (5th Cir. 1968).

In *Rawls*, the insured, Bess, was being pursued by two deputy sheriffs in a high-speed automobile chase. 404 F.2d at 880. Bess collided with the rear of a northbound vehicle, continued northward and collided with a southbound vehicle a few seconds later, when he crossed the center line of the highway. *Id*. The insurer argued that its liability was limited to $20,000 as "the total limit of the company's liability as the result of any one accident." *Id*. (internal quotations omitted). The district court found, however, that there were two separate accidents, and the Fifth Circuit affirmed, stating that the impacts were "2 to 5 seconds apart and 30 to 300 feet apart," and that "Bess had

---

[2]The provisions of the policy in Sections A (liability coverage) and Section B (medical payments coverage) are nearly identical to those written above; the limitation for liability coverage is $500,000 for "each accident" and medical payments coverage is limited to $10,000 for each person. (Rec. Doc. 15-9 at 9, 14, 16).

6

control of his vehicle after the initial collision." *Id*. The Fifth Circuit noted that either the causation theory or the effects theory supported this finding, without further explanation. *Id*. at 881.

In *Redden v. Doe*, a Louisiana court applied the effect test to find that a victim's injuries resulted from an accident within the meaning of her uninsured motorists policy. 357 So.2d 632, 634 (La.App. 1978). There, the issue was not whether there was more than one accident, but whether a victim's injuries, proximately caused by the intentional acts of an uninsured motorist, fell under her policy. *Id*. at 633. The insured and her husband sued their insurer and an unknown motorist after their car was forced off a highway by two cars driven by "would-be robbers." *Id*. Plaintiffs' car slid into a bayou and the insured suffered injuries when she was pulled from the car by one of her assailants. *Id*. The insurer argued that those injuries were not a result of the "accident" within the contemplation of the policy, and that "the accident was at an end when the car came to rest in the bayou." *Id*. at 634. The court, however, affirmed the judgment below and the finding that the accident did not end until the plaintiff driver had escaped the vehicle. *Id*. Quoting the trial court,

> the term 'accident' as used in the policy of insurance includes the entire sequence or chain of events which began with the bumping of Mrs. Redden's automobile by the uninsured motorist and was not concluded until she had exited and completely escaped from her vehicle....the injuries were sustained while escaping from the partially submerged automobile and were a direct consequence of the accident.

*Id*.

The present parties cite cases from other state courts to support their respective positions. These cases, though not binding on this Court, are instructive in fleshing out the causation and effect theories. In *Illinois National Insurance Co. v. Szczepkowicz*, an Illinois state court applied the causation test and found that more than one accident occurred when the defendant's tractor-trailer was struck from behind as he attempted to cross four lanes of traffic in heavy fog, and was struck again five minutes later by a different vehicle. 542 N.E.2d 90, 91 (Ill. App. 2d, 1989). According

to the *Szczepkowicz* court, "[c]ourts applying the 'cause theory' uniformly find a single accident 'if cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event." *Id*. at 92. The court found that the test for a single accident, "continuous or repeated exposure either to the same or to substantially the same conditions," was unmet, and affirmed the circuit court's summary judgment in favor of plaintiffs. *Id*. "Two separate, distinct collisions occurred five minutes apart....there was no single force, nor an unbroken continuum that, once set in motion, caused multiple injuries." *Id*. at 93 (internal citations omitted). The court also noted that Szczepkowicz did not lose control of his vehicle after it was struck the first time. *Id*. at 93.

Amica cites a Washington Supreme Court case in which the defendant was driving a vehicle on a state highway, crossed the center line, and collided with three motorcycles in succession as his vehicle was spinning out of control. 303 P.2d 659, 660 (Wa. 1956). There, the court found that the insurer's policy, which provided for a limitation of liability of $50,000 for each occurrence, contemplated that there "could be more than one impact damaging or destroying more than one item of property and resulting in injury to more than one person." *Id*. at 662. The court found there was just a single accident.

> [A]s a direct result of the insured's negligence, his vehicle went out of control, either before or simultaneously with the first collision, and ... it remained out of control until it came to rest after the third collision. There was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.

*Id*. at 663.

These cases, and the parties' arguments, make clear that the element of "control" is essential to determining whether there was a single accident or more. Where a person loses control of the trajectory of his vehicle and strikes more than one person or vehicle, a court is more likely to find

only one accident. *See*, *e.g.*, *Olsen v. Moore*, 202 N.W.2d 236 (Wis. 1972) (a single accident where a vehicle crossed a median, struck an oncoming vehicle and glanced immediately into another car). If a driver remains in control of the motion of the vehicle, after an initial collision and before a second or third one, a court may be persuaded that more than a single accident occurred. *See*, *e.g.* *Rawls*, 404 F.2d 880; *Szczepkowicz*, 542 N.E. 2d 90.[3]

**D. Plaintiffs Argue That There Were Four Distinct Accidents**

Plaintiffs describe four distinct occasions in which Lamb made physical contact with their vehicle, and urge that each time Lamb collided with their minivan, a separate insurable event occurred, allowing them access to four distinct policy limits. (Rec. Doc. 15-3 at 1). In support of their claim, Plaintiffs cite several cases mentioned above, in which a court found that two or more distinct collisions occurred, rather than one continuous event. Plaintiffs argue that "[t]he events in question involved four distinct collisions indisputably separated by minutes and miles," and the facts describing the circumstances of the collisions support that assertion. (Rec. Doc. 15-3 at 13).

Though Plaintiffs, unlike Amica, do not use the element of "control" as a linchpin in their argument that four separate accidents occurred, their description of the facts suggests that Lamb had complete control over the course and motion of his vehicle. As described above, Lamb seemed to target their vehicle, following the Plaintiffs' minivan from the initial collision on Interstate 59 to Fremaux Avenue, in Slidell. (Rec. Doc. 15-2 at 2-3). Lamb was able to collide with the Plaintiffs' vehicle three times from behind, but also backed into them when they were stopped on the shoulder of Interstate 10. (Rec. Doc. 15-2 at 3). This series of actions suggests that while Lamb may have

---

[3] The Court notes two of many distinct definitions of the term "control:" 1) (v) to exercise restraining or directing influence over, as a situation; 2) (n) effective and reliable skill in the use of a tool or instrument, as a vehicle. *See* Websters New International Dictionary 496 (3d ed. 1966).

been too intoxicated to remember any of this, he was in control of the vehicle enough to make deliberate decisions about how and where to drive it. Amica, however, would define the term "control" in a much broader sense, in such a way as to enfold all four collisions into one incident.

### E. Defendant Argues There Was a Single Accident

Amica does not contest the fact that Lamb made contact with Plaintiffs' vehicle at four distinct points in time. Its argument is that there was only one "uninterrupted" cause of the accident, and therefore only one insurable event occurred. (Rec. Doc. 20 at 7). Amica refers to both the causation test and the effect test, and states that Louisiana most frequently applies the former, but cites no Louisiana authority for that proposition. (Rec. Doc. 20 at 7). Under the causation test, Amica argues, the cause of the four collisions with Plaintiffs' vehicle was "the erratic driving of an intoxicated driver," and no intervening causes separated the collisions into separate insurable events. *Id.* at 8. Amica also claims that Lamb had no control whatsoever over the vehicle during the time in which Plaintiffs' vehicle was impacted, because he was so highly intoxicated. *Id.* at 14. By defining the cause of the accident so broadly, and denying that Lamb ever was in control "of the vehicle or the situation in general," Amica argues only one cause existed and only one accident occurred. *Id.* at 12-13.

Applying *Rawls* to the facts of this case, however, the Court finds Amica's arguments unpersuasive. Under *Rawls*, the pertinent facts are 1) Lamb maintained control of his vehicle between each collision with Plaintiffs' vehicle, 2) the impacts occurred several minutes apart, over a span of several miles, and 3) there were four separate impacts, or "more than a single sudden collision," all of which indicate that four separate insurable accidents occurred. 404 F.2d at 880. Amica states that *Rawls* is distinguishable on the facts because the collisions there "were the result

10

of a high speed chase." (Rec. Doc. 20 at 14). By that logic, however, the high speed chase in *Rawls* would have been the singular "cause" of the accidents, and only one insurable event would have occurred. The *Rawls* court, however, found two distinct accidents, because of the time and distance separating the impacts and the evidence that Bess maintained control of his vehicle. 404 F.2d at 880.

Amica cites *Redden* in support of its argument for a single accident and states it "demonstrates that when multiple accidents or occurrences are involved in a series of events spawned by one negligent or tortious act, one (1) rather than multiple accidents occur for purposes of insurance policy limits." (Rec. Doc. 20 at 9); 357 So.2d 632. The Court finds *Redden* distinguishable, however, because the question there was not whether there was more than one insurable accident, but whether the insured's injuries (inflicted intentionally by an uninsured motorist) were covered at all by her uninsured motorist policy. 357 So.2d at 633. Nor do the other cases cited by Amica define causation so broadly for the purpose of determining the number of accidents.

## IV. Conclusion

For the reasons stated above,

IT IS ORDERED that Plaintiffs' Motion for Partial Summary Judgment is hereby GRANTED. (Rec. Doc. 15).

New Orleans, Louisiana, this 14th day of April, 2011.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**